# In the United States Court of Federal Claims

**No. 09-515L**
**(Filed: April 7, 2011)**

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * | * |
| | * |
| **MACY ELEVATOR, INC.,** | * **Fifth Amendment Takings Clause;** |
| **et al.,** | * **Rails to Trails; National Trails System** |
| | * **Act Amendments of 1983, 16 U.S.C. §** |
| **Plaintiffs,** | * **1247(d); Indiana Law; Interest of** |
| | * **Adjoining Landowner to Railroad** |
| **v.** | * **Right-of-Way; Railroad Easement** |
| | * **Abandonment, Ind. Code § 32-5-12-6** |
| **THE UNITED STATES,** | * **(2010); Scope of Railroad Easement** |
| | * |
| **Defendant.** | * |
| | * |
| * * * * * * * * * * * * * * * * * * | * |

*J. Robert Sears*, St. Louis, MO, for plaintiffs, with whom were *Brent W. Baldwin* and *Steven M. Wald*, St. Louis, MO and *Thomas S. Stewart* and *Elizabeth G. McCulley*, Kansas City, MO.

*Lary Cook Larson,* U.S. Department of Justice, Washington, DC, with whom was *Ignacia S. Moreno,* Assistant Attorney General.

**O P I N I O N**

**FIRESTONE**, *Judge*.

The plaintiffs in this class action[1] are landowners who claim to own the fee interest

_____

[1]The court granted the plaintiffs' motion for class certification on December 8, 2009. Order Granting Class Certification, ECF No. 16. The court found that the requirements of numerosity, commonality of issues, typicality, adequacy, and superiority were satisfied and adopted the parties' Joint Proposed Plan for Providing Notice to the Opt-in Class. The plaintiffs filed an amended complaint on March 10, 2010. The total number of plaintiffs in the class is approximately seventy-five.

in land underlying a previously-operating railroad line of the Norfolk and Western Rail Company ("N&W")[2] between milepost I-75.5, near Peru, Indiana and milepost I-95.6, near Rochester, Indiana.  The plaintiffs claim that the defendant ("government") affected a taking of the plaintiffs' fee interest in the railroad right-of-way between the mileposts when the government approved conversion of the subject railroad line to a recreational trail pursuant to the "railbanking" provision of the National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d) ("Trails Act").  The plaintiffs claim that by authorizing a recreational trail on the right-of-way the government has established a new easement on their fee land.  The plaintiffs are now seeking just compensation pursuant to the Takings Clause of the Fifth Amendment of the United States Constitution for the alleged taking of a new easement associated with the government's authorization of the recreational trail.

Pending before the court are the parties' cross-motions for summary judgment as to whether there has been a taking of the plaintiffs' property interests by virtue of the government's authorization of a recreational trail on the subject right-of-way.

## I.      BACKGROUND

### A.      The Trails Act

Congress enacted the Trails Act to address the national problem of a reduction in

---

[2]N&W is now the Norfolk Southern Railway Company, but "N&W" is used throughout to denote both companies.

rail tracks.  Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 5 (1990) ("Preseault I").  The Trails Act authorizes the Surface Transportation Board ("STB")[3] to preserve railroad corridors or rights-of-way not currently in use for train service for possible future rail use by converting those rights-of-way into recreational trails.  Id. at 5-6; 16 U.S.C. § 1241 (2006).  In essence, the Trails Act allows a railroad to relinquish responsibility for a rail line by transferring the corridor to an entity that will use it as a recreational trail.  Although the corridor is not used as a railroad during the period of interim trail use, it remains intact for potential future use for rail service.  This process is called "railbanking."

Before a railroad corridor may be converted into a recreational trail, the railroad must either initiate abandonment proceedings with STB under 49 U.S.C. § 10903 (2006) (where the railroad has recently had operating train service) or seek an exemption from the ordinary abandonment procedures under 49 U.S.C. § 10502 (2006) (where the railroad has had no local rail service for at least two years).[4]  Caldwell v. United States, 57 Fed.

---

[3]The Transportation Act of 1920, 41 Stat. 477-78, initially gave the Interstate Commerce Commission ("ICC") authority over railroad abandonments; this authority is now held by the STB following enactment of the ICC Termination Act of 1995, 49 U.S.C. § 10501 (1996).

[4]STB's regulations provide:

An abandonment or discontinuance of service or trackage rights is exempt if the carrier certifies that no local traffic has moved over the line for at least 2 years and any overhead traffic on the line can be rerouted over other lines and that no formal complaint filed by a user of rail service on the line (or a state or local government entity acting on behalf of such user) regarding cessation of service over the line either is pending with the Board or any U.S. District Court or has been decided in favor of the complainant within the 2-year period.  The complaint must allege (if pending),

Cl. 193, 195 (2003) ("Caldwell I"), aff'd, 391 F.3d 1226 (Fed. Cir. 2004) ("Caldwell II").

Under either procedure, abandonment of the rail line and right-of-way will not be

approved by the STB if a qualified trail provider[5] submits to the STB a request to use the

right-of-way as a recreational trail.  If the trail provider submits a statement of willingness

to assume financial and legal responsibility to the STB and the railroad, the STB will, in

the case of an operating railroad issue a Certificate of Interim Trail Use or Abandonment

("CITU") which preserves the STB's jurisdiction over the rail corridor while the parties

negotiate an Interim Trail Use Agreement.  See 49 C.F.R. § 1152.29(c) (2010).  In cases

involving the exemption procedure, such as the present case, the STB issues a Notice of

Interim Trail Use or Abandonment ("NITU"), which also preserves the STB's jurisdiction

over the rail corridor, allows the railroad to discontinue operations and remove track and

equipment, and affords the railroad and the trail provider 180 days to negotiate a

railbanking and interim Trails Act Agreement.  Caldwell II, 391 F.3d at 1229-30;

---

or prove (if decided) that the carrier has imposed an illegal embargo or other unlawful impediment to service.

49 C.F.R. § 1152.50(b) (2010).  The STB must also find that the line is not necessary to carry out the government's rail transportation policy, the line is of limited scope, and continued regulation is unnecessary to protect shippers from abuse of market power.  Id. § 1152.50(c).

 The railbanking process works in largely the same manner, whether the proceeding is exempt from the abandonment process or non-exempt.

 [5]The statute defines "qualified trail provider" as a "state, political subdivision, or qualified private organization that is prepared to assume full responsibility for management of [railroad] rights-of-way and for any legal liability arising out of such transfer or such use, and for the payment of any and all taxes that may be levied or assessed against the [railroad] rights-of-way."  16 U.S.C. § 1247(d).

<u>Caldwell I</u>, 57 Fed. Cl. at 195; 49 C.F.R. § 1152.29(d). During this period, the railroad will also negotiate an agreement for the transfer of the corridor to the trail operator.[6] "If an agreement is reached, the NITU [or CITU] automatically authorizes the interim trail use. If the [STB] takes no further action, the trail sponsor then may assume management of the right-of-way, subject only to the right of a railroad to reassert control of the property for restoration of rail service." <u>Caldwell I</u>, 57 Fed. Cl. at 195 (internal citations omitted); <u>see also</u> 49 C.F.R. § 1152.29(d)(2). If an agreement is not reached, the railroad will be allowed to abandon the line, at which time the STB's jurisdiction over the right-of-way terminates.[7]

## B.     The NITU and Trail Use Agreement[8]

On May 14, 1996, the STB granted an abandonment exemption to N&W covering 38.4 miles of rail line between milepost I-57.2 and milepost I-95.6. The Indiana Trails Fund ("ITF") and Hoosier Rails-To-Trails Council, Inc. had requested issuance of a NITU for this line segment, but the STB authorized the NITU only for the portion of line

---

[6]As discussed <u>infra</u> Part I.B, in this case, the railroad transferred its interest in the portion of the corridor at issue before a NITU was issued.

[7]As explained above, issuance of a CITU or a NITU is an alternative to the standard process of approving the railroad's application for abandonment. Where the STB issues an order authorizing the railroad to abandon the line and the railroad carries out the abandonment, the STB's jurisdiction over the railroad right-of-way terminates. <u>Hayfield N. R.R. Co. v. Chicago & N.W. Transp. Co.</u>, 467 U.S. 622, 633-34 (1984); <u>Preseault I</u>, 494 U.S. at 7; <u>Caldwell I</u>, 57 Fed. Cl. at 195 (citing <u>Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.</u>, 158 F.3d 135, 139 (D.C. Cir. 1998)).

[8]The following facts are not in dispute unless otherwise noted.

between I-57.2 and I-74.2 because the Indiana Hi-Rail Corporation ("IHRC") still possessed trackage rights over the segment from I-74.2 to I-95.6. The STB stated that because the abandonment process of this latter segment could not be completed until discontinuance of IHRC's trackage rights was authorized, it would not be appropriate for the STB to issue a NITU for that segment of the line. The STB indicated that it reserved jurisdiction to issue a NITU when IHRC discontinued its trackage rights.

The STB's 1996 decision stated, "If no trail use condition is sought within 10 days after N&W notifies the trail user of IHRC's discontinuance, then N&W may complete the abandonment process as to that portion of the line." N&W did notify ITF of IHRC's discontinuance of its trackage rights, and N&W and ITF reached a trail use agreement in 1998. However, ITF made no renewed request for a NITU during this period. On January, 29, 1999, N&W transferred its interests in the corridor to ITF by three quitclaim deeds.

On February 17, 2004, ITF submitted to the STB a request for a NITU for the portion of the line between I-75.5 and I-95.6, the portion of the line at issue in this case. ITF requested that the "technical defect" of not having obtained a NITU before proceeding with transfer to the trail provider "be remedied." Pls.' Prop. Find. Uncont. Fact ("PPFUF") Ex. E, ECF No. 28-5.

In its March 8, 2004 decision, the STB accepted ITF's late-filed request and issued a NITU, allowing N&W and ITF to either reach a new agreement or confirm the

agreement previously reached.  On March 31, 2004, ITF notified the STB that it and

N&W had finalized their agreement, and ITF assumed (as it had since accepting the deeds

in 1999) full responsibility for the relevant portion of line.  In this notice, ITF stated that

N&W had "removed its personal property (rails, ties, and other track stuff)."  PPFUF Ex.

F, ECF No. 28-6.

On May 10, 2004, the STB denied reconsideration of its decision to issue the

NITU.  The petitioners, including plaintiffs in the present litigation, argued that N&W

had abandoned the rail line before the STB issued its NITU.  The STB held:

> ITF and [N&W] acted in compliance with the essential requirements of the
> Trails Act in agreeing to, and in actually conveying, both the Southern Trail
> Segment and the Northern Trail Segment to ITF for trail use.  However, they
> overlooked the board's May 14, 1996 direction for ITF to re-apply for a NITU
> for the segment of the line between MP I-74.2 at Peri, IN and MP I-95.6 at
> Rochester, IN (Northern Segment) after the U.S. Bankruptcy Court would
> terminate [IHRC's] trackage rights over that Northern Segment of the Line.
> While ITF did not make this request until several years after the Board's May
> 14, 1996 decision, it was not necessary to do so for the valid establishment of
> interim trail use on the Line because [N&W] and ITF had complied with the
> essential requirements of the Trails Act in reaching the 1998 agreement and
> closing the 1999 conveyance.  The [2004] NITU request was timely because
> [N&W] had not consummated abandonment of any portion of the Line except
> the Northern Peru Segment [between I-74.2 and I-75.5] prior to the date ITF
> made the request and [N&W] supported it.
> . . .
> It is well settled that the Board can issue a NITU in response to a late-filed
> request, or reinstate a NITU negotiation period that has expired, if the railroad
> has not consummated abandonment of the subject line.  The interim trail use
> agreement and conveyance to ITF of the Trail Segments of the Line's right-of-
> way conclusively demonstrate [N&W]'s continuous intention to convey the
> Trail Segments of the Line included in the agreement and conveyance for trail
> use, not to abandon them.

Def.'s Prop. Find. Uncont. Fact Ex. H, ECF No. 34-1.

### C.      The Landowners and the Original Railroad Conveyances

The plaintiffs in this case are the individuals and entities that owned land abutting the N&W railroad right-of-way on the date of the STB's issuance of the NITU on March 8, 2004.[9]  N&W, through its predecessors, acquired its interests in the rail right-of-way during the second half of the 19th century.  The manner in which N&W acquired its rights is shown in a schedule filed by N&W's predecessor with the ICC in 1918.  The parties reviewed seventy-four deeds[10] and are in agreement that fourteen of the deeds conveyed the right-of-way corridor to the railroad in fee, and the plaintiffs are not seeking compensation in connection with the properties abutting those sections of the right-of-way.[11]  The rest of the deeds conveyed only an easement to the railroad.  Other sections of the right-of-way were acquired by prescription or condemnation.  It is the scope of these

---

[9]In most cases, the plaintiffs' present deeds do not describe the land underlying the railroad right-of-way.  In at least one case, a plaintiff's land is separated from the railroad right-of-way by a road and in others the railroad owns a fee interest in land on either side of the right-of-way.

[10]Not every one of these deeds necessarily applies to property owned by a class member. The plaintiffs state, "[T]he precise location to which each conveyance applies will (assuming the Court declares there was a compensable taking affecting the subject Railroad Line) be subject to later mapping by a professional engineering/surveying firm or by some other method calculated to determine the precise boundaries of each claimant's land and claim for damages." Pls.' Mot. Summ. J. 7, ECF No. 26.

[11]The plaintiffs do not seek nor are they entitled to damages for any property covered by the deeds that conveyed a fee interest to the railroad.  See Preseault II, 100 F.3d at 1335 ("Obviously if the railroad owns the right-of-way in fee simple, there is no owner of a separate underlying property interest to claim the rights of the servient estate holder.").

8

easements, however created, that is at the heart of the present motion.[12]

For simplicity, the court has grouped the deeds that conveyed an easement to the railroad into three categories based upon similarities in the language of the instruments. Each is described below.

### 1.    "Release of Right of Way" Deeds

The most numerous type of deed received by N&W in this case provided an easement for a right-of-way without any other specific limiting language.  Each of these deeds contains a variation on the following operative language:

> Release of Right of Way
>
> [Named Landowner] . . . for and in consideration of [variable amounts of consideration] . . . and the advantages which may or will result to the public in general and myself in particular by the construction of the Chicago, Cincinnati & Louisville RailRoad as now surveyed or as the same may finally be located and for the purpose of facilitating the construction and completion of said work, do hereby for myself, my heirs, executors, administrators and assigns, release, relinquish forever, quit claim and convey to the Chicago, Cincinnati, & Louisville Railroad Company and assigns the Right of Way [varying width] for so much of said road as passes through or over the following real estate . . . to wit:
>
> Being part of [quarter, township, range description of land over which right-of way runs].
>
> And I further hereby release and relinquish to the Said RailRoad Company all assigns all damages all rights of damages actions and causes of action whatever which I might sustain or be entitled to by reason of anything connected with consequent upon or growing out of the location or construction

---

[12]Relatedly, after the conclusion of briefing on the cross-motions for summary judgment, the government filed a motion for leave to supplement the record with certain original deeds and for leave to file a supplemental memorandum regarding these deeds.  Def.'s Mot. Leave to Supp. R. & File Suppl. Br., ECF No. 42.  The court granted that motion in an order dated February 17, 2011.  The plaintiffs subsequently filed a response to the defendant's supplemental memorandum.

of said road or the repairing thereof where finally established and completed.

See, e.g., Def.'s Suppl. Mem. Ex. G, ECF No. 42-5.

### 2.   The Hakins, Hurst, and Schindler Deeds

The Hakins deed, the Hurst deed,[13] and the Schindler deed are similar to but in a

form distinct from the above-described Right of Way deeds.

The Hakins deed is on a pre-printed form with handwritten modifications and

provides:

> George Hakins and his wife Jane Hakins in consideration of the location and construction of the Chicago Cincinnati & Louisville RAILROAD and Fifty dollars . . . paid by the Chicago Cincinnati & Louisville RAILROAD COMPANY . . . DO GIVE, GRANT, BARGAIN, SELL AND CONVEY to said Company the Right of Way for use of the Railroad of said Company over and across [the described property] for the width or space of forty feet on each side of the center line of said Road, as now and as may be hereafter located, and for the length the distance between the limits of said tract, to include also the right of said Company to take materials, except timber, for the construction and repairs of said Road, at any point within forty feet of said line, together with the Right of Way over said tract sufficient to enable said Company to construct and repair its Road, and the right to conduct water by aqueducts, and the making of proper drains.  To have and to hold the said Rights and Privileges to the use of said Company, so long as the same shall be required for the use and purposes of said Road, in as full, perfect and ample a manner as may be required for that purpose.

Id. Ex. M, ECF No. 42-7.

The Hurst deed is similar to the Hakins deed although it does not use the same pre-

printed form.  It provides:

---

[13]There are two Hurst deeds at issue in this case.  The one discussed by name in this opinion is that found at Exhibit N to the defendant's supplemental memorandum.  The other, a Release of Right of Way deed, is found at Exhibit S to that memorandum.

> I. B. Hurst . . . in consideration of one hundred and fifty (150) dollars . . . paid by the Chicago, Cincinnati and Louisville Railroad Company. . . does give, grant, bargain, sell and convey to said Company the right-of-way over and across the northwest quarter of the northeast quarter of section 19, township 29, range 4 . . . for a width or space of eighty feet (or 40 on eac[h] side of the center line of said road as now located) and of length the distance between the limits of said tract; to include also the right of said Company to take materials except timber for the repair of said line, and the right to conduct water by aqueducts and the right of making of proper drains.
>
> To have and to hold the said rights and privileges to the use of said Company so long as the same shall be required for the use and purposes of said road in as full and perfect and ample a manner as may be required for that purpose.

Id. Ex. N, ECF No. 42-7.

> The Schindler deed is on a pre-printed form and provides:
>
> William Schindler and Margaret J. Schindler, his wife . . . in consideration of the sum of ($1.00) One dollars . . . paid by The Lake Erie & Western Railroad Company . . .do hereby grant, release, convey and warrant to said The Lake Erie & Western Railroad Company, for the purpose of constructing its said Railroad, the right of way (80) eighty feet in width, that is to say (40) forty feet wide on each side of the center line of its said Railroad, as the same is now located and constructed across [the described land] with the right to construct, operate and maintain a Railroad and all necessary appurtenances, across and upon the land above designated, together with the right to use all materials necessary in such construction and maintenance which are included in the land hereby conveyed.
>
> To have and to Hold The above granted premises, rights and privileges, for the uses and purposes above mentioned, to said The Lake Erie & Western Railroad Company, its successors and assigns forever.

Id. Ex. O, ECF No. 42-7.

### 3.    "Railroad Purpose" Deeds

Three of the deeds at issue are characterized as "Railroad Purpose" deeds because

they contain specific limiting language: the Railroad Purposes Gould deed,[14] the Brower deed, and the Pense deed.

The operative language of the Railroad Purposes Gould deed provides:

Release of Right of Way
    James Gould . . . .
    For and in consideration of Two hundred dollars . . . and the advantages which may or will result to the public in general and myself in particular, by the construction of the Chicago, Cincinnati & Louisville RailRoad as now surveyed, or as the same may finally be located and for the purpose of facilitating the construction and completion of said work, do hereby for myself, my heirs, executors, administrators and assigns, release, relinquish forever, quit claim and convey to the Chicago, Cincinnati, and Louisville Railroad Company and assigns the Right of Way Eighty feet in width for so much of said road as passes or may pass through or over the following real estate . . . to wit:
    Being part of the Fractional North East quarter of Section number (2) Two of Township Number (29) Twenty -nine, North of Range (3) Three East.
    And I further hereby release and relinquish to the Said RailRoad Company and assigns, all rights of damages, whatever, which I may have sustained by measure of anything connected with location or construction of said Road.
. . .
    When said land herein released Shall cease to be used for Rail Road

---

[14]Two different instruments signed by John Gould are at issue in this litigation. The first, marked Plf 215 and 223, is dated February 5, 1869 and conveys an interest in Section 2, Township 29 North, Range Three East for $200. The parties stipulated that this "Railroad Purposes Gould deed" conveyed only an easement to the railroad, although the scope of that easement is disputed. The second "deed," marked Plf 211-213, is dated August 12, 1870 is more in the nature of a receipt related to condemnation of an interest in Section 1, Township 29 North, Range 3 East for $135. This document was identified as the sole conveyance to which the parties were unable to stipulate regarding the general nature of the conveyance to the railroad. However, the defendant's memorandum regarding original deeds identifies this instrument as a Release of Right of Way deed, indicating its agreement with the plaintiffs that the instrument conveyed only an easement, and not fee, to the railroad. The plaintiffs, in their final brief, argue that this document is "merely a receipt recorded to show payment pursuant to [a] condemnation order." Pls.' Resp. to Def.'s Suppl. Mem. 4, ECF No. 47.

purposes, it shall revert back to the original tract.

Id. Ex. I, ECF No. 42-5.  This deed is essentially the same as the release of right of

way deeds except for the addition of the last sentence with the reference to "Rail

Road purposes."

The operative language in the Pence deed provides:

> Release of Right of Way
> I, John Pence . . . for and in consideration of the benefits that may accrue to me from the construction of the RailRoad and of the advantages which may or will result to the Public in General and myself in particular by the Construction of the Chicago Cincinnati & Louisville RailRoad as now surveyed or as the same may finally be located and for the purpose of facilitating the Construction and Completion of Said Work do hereby for myself my heirs executors administrators and assigns release relinquish forever Quit-Claim and Convey to the Chicago Cincinnati, & Louisville RailRoad Company and assigns the Right of Way Sixty-six feet in width for So much of Said Road as passes or may pass through or over the following Real Estate . . . to wit:  Being part of the North East quarter of the North East quarter of Section o 21 of Township No 30 North & Range No 3 East.  Said land 66 feet wide to be held and enjoyed by Said RailRoad Company So long as it shall be used for a Rail Road & no longer.  And I further hereby release and relinquish to the Said RailRoad Company all assigns all damages all rights of damages actions and causes of action whatever which I might sustain or be entitled to by reason of anything connected with consequent upon or growing out of the location or construction of Said Road or the repairing thereof when finally established and completed.

Id. Ex. J, ECF No. 42-5.  Like the Gould deed, this deed is essentially the same as the

release of right of way deeds except for the addition of the clause, "Said land 66 feet wide

to be held and enjoyed by Said RailRoad Company So long as it shall be used for a Rail

Road & no longer."

The operative language of the Brower deed provides:

13

> This Indenture Witnesseth, That George Brower . . . CONVEY AND
> WARRANT to the Chicago Cincinnati & Louisville Railroad Company . . . for
> the sum of one hundred and fifty dollars . . . The Right of Way over the
> following REAL ESTATE in Miami County, in the State of Indiana to-wit: So
> long as said Company may use the same for Railroad purposes to-wit: A part
> of the Weasaw Reserve [metes and bounds description using center line of said
> C.C.&L. R.R. as a reference point] . . . Said several strips being 80 feet in
> width or forty feet on each side of the center line of said RR track containing
> three (3) Acres more or less.

Id., Ex. A, ECF No. 42-4.  The deed is a fee deed form that was modified to add the

words "The Right of Way over" before the words "the following REAL ESTATE."

### D.    Relevant Indiana Statutes

Following passage of the Trails Act, and long after the right-of-way conveyances

at issue in this litigation, Indiana enacted a series of statutes concerning the abandonment

of railroad rights-of-way.  The Indiana code with regard to the "Requirements for

abandonment" provides:

> (a) Except as provided in subsection (b) and in sections 7 and 8 of this chapter,
> a right-of-way is considered abandoned if any of subdivisions (1) through (3)
> apply:
>     . . .
>     (2) After February 27, 1920, both of the following occur:
>         (A) The [STB] issues a certificate of public convenience and
>         necessity relieving the railroad of the railroad's common carrier
>         obligation on the right-of-way.
>         (B) The earlier of the following occurs:
>             (I) Rails, switches, ties, and other facilities are removed
>             from the right-of-way, making the right-of-way unusable
>             for continued rail traffic.
>             (ii) At least ten (10) years have passed from the date on
>             which the [STB] issued a certificate of public
>             convenience and necessity relieving the railroad of its
>             common carrier obligation on the right-of-way.

14

. . .
(b) A right-of-way is not considered abandoned if:
    (1) rail service continues on the right-of-way; or
    (2) the railroad has entered into an agreement preserving rail service on
    the right-of-way.

Ind. Code § 32-5-12-6 (2010).  Indiana Code in Section 32-5-12-7 further provides, "A

right-of-way is not considered abandoned if the [STB] imposes on the right-of-way a trail

use condition under 16 U.S.C. [§] 1247(d)."  Ind. Code § 32-5-12-7 (2010).  Finally,

Section 32-5-12-8 provides:

> (a) A right-of-way is not considered abandoned if the following conditions are
> met:
>     (1) The railroad sells the railroad's rights in the right-of-way before
>     abandoning the right-of-way.
>     (2) The purchaser of the railroad's rights in the right-of-way is not a
>     railroad.
>     (3) The purchaser purchases the right-of-way for use by the purchaser
>     to transport goods or materials by rail.
> (b) A railroad may discontinue rail service on the right-of-way without
> abandoning the right-of-way.

Ind. Code § 32-5-12-8 (2010).

## II.   DISCUSSION

### A.   Standard of Review

Pursuant to Rule 56 of the Rules of the Court of Federal Claims ("RCFC"),

summary judgment is appropriate when "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law."  RCFC 56(c)(1); see

also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Casitas Mun. Water

Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008); Telemac Cellular Corp. v.

Topp Telecom, Inc., 247 F.3d 1316, 1323 (Fed. Cir. 2001) (citation omitted).  In

considering a motion for summary judgment, the court's role is not to "weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." Liberty Lobby, 477 U.S. at 249.  "The evidence of the nonmovant is to be

believed, and all justifiable inferences are to be drawn in his favor." Id. at 255; see also

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Casitas

Mun. Water Dist., 543 F.3d at 1283; Lathan Co., Inc. v. United States, 20 Cl. Ct. 122, 125

(1990).

**B.      The Trails Act and the Fifth Amendment Takings Clause**

The Takings Clause of the Fifth Amendment provides in relevant part that "private

property [shall not] be taken for public use, without just compensation." U.S. Const.

Amend. V.  "The Amendment 'does not prohibit the taking of private property, but

instead places a condition on the exercise of that power.'" Preseault I, 494 U.S. at 11

(quoting First English Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles,

482 U.S. 304, 314 (1987)).  In cases involving the Trails Act, it is now settled that if the

government takes private property by authorizing recreational trail use of a railroad right-

of-way, the government must provide just compensation. Preseault I, 494 U.S. at 12-16.

It is equally settled that "only those individuals 'with a valid property interest at the time

of the taking are entitled to compensation.'" Wyatt v. United States, 271 F.3d 1090, 1096

(Fed. Cir. 2001) (citing <u>Cienega Gardens v. United States</u>, 331 F.3d 1319, 1328 (Fed. Cir. 2003)); <u>see also</u> <u>Phillips v. Wash. Legal Found.</u>, 524 U.S. 156, 164 (1998) ("Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" (citation omitted)).  Because real property rights arise from state law, the extent of the plaintiffs' property interests in the right-of-way depend on the law of the state in which the property is located.[15]  <u>See</u> <u>Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.</u>, 130 S. Ct. 2592, 2597 (citing <u>Phillips</u>, 524 U.S. at 164); <u>Ruckelshaus v. Monsanto Co.</u>, 467 U.S. 986, 1001 (1984); <u>Foster v. United States</u>, 607 F.2d 943 (Ct. Cl. 1979)).  More specifically, whether the Trails Act effects a taking in a particular case depends "upon the nature of the of the state-created property interest that petitioners would have enjoyed absent the federal action and upon the extent that the federal action burdened that interest."  <u>Preseault I</u>, 494 U.S. at 24 (O'Connor, J., concurring).  Thus, the Federal Circuit has determined that a taking occurs where the issuance of the CITU or NITU authorizing recreational trail use effectively

---

[15]While Indiana does have a statute allowing the certification of questions of state law to the Supreme Court of Indiana, the statute provides for certification only by "the Supreme Court of the United States, a circuit court of appeals of the United States, or the court of appeals of the District of Columbia."  Ind. Code § 33-24-3-6 (2008).  Although the defendant notes that Rule 64(A) of the Indiana Rules of Appellate Procedure allows for certification by a federal district court, this court, having not been specifically named in the relevant statute or rule, does not appear to possess the ability to certify questions to the Indiana Supreme Court.  Further, as discussed below, the court finds that sufficient Indiana precedent exists to render a judgment based on state law.  For these reasons, the government's motion to certify question of state law to the Indiana Supreme Court is **DENIED.**

extinguishes the state property rights of reversion of the right-of-way to the fee owner.[16]

As the Circuit has recently stated, "it is settled law that a Fifth Amendment taking occurs

in Rails-to-Trails cases when government action destroys state-defined property rights by

converting a railway easement to a recreational trail, if trail use is outside the scope of the

original railway easement." Ladd v. United States, 630 F.3d 1015, 1019 (Fed. Cir. 2010).

The Federal Circuit has explained that these Rails-to-Trails cases present three primary

questions:

> (1) who owned the strips of land involved, specifically did the Railroad . . .
> acquire only easements, or did it obtain fee simple estates; (2) if the Railroad
> acquired only easements, were the terms of the easements limited to use for
> railroad purposes, or did they include future use as public recreational trails;
> (3) even if the grants of the Railroad's easements were broad enough to
> encompass recreational trails, had these easements terminated prior to the
> alleged taking so that the property owners at that time held fee simples
> unencumbered by the easements.

Preseault II, 100 F.3d at 1533; see also Ellamae Phillips Co. v. United States, 564 F.3d

1367, 1373 (Fed. Cir. 2009).  Thus, if the railroad did not receive a fee interest but only a

railway easement and if the recreational trail use authorized by the NITU exceeds the

scope of that railway easement, then a taking has occurred.  Ladd, 630 F.3d at 1019.

    In this case, the parties are in agreement as to the easement versus fee interest

---

[16]Regarding the government action that gives rise to a taking, the Federal Circuit has held that "[t]he issuance of the NITU is the only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way."  Caldwell II, 391 F.3d at 1233-34; see also Ladd v. United States, 630 F.3d 1015, 1023-24 (Fed. Cir. 2010).

acquired by the railroad in each of the relevant conveyance instruments.  The question of

the scope of those easements and whether they authorize recreational trail use is at the

heart of the briefing now before the court.  However, before turning to the scope of the

easements at issue, the court first addresses the government's claim that many of the

plaintiffs in this case do not have a property interest subject to a taking because they do

not have a property interest in the underlying right-of-way.  Each of the government's

arguments will be addressed in turn.

C.      **Nature of the Plaintiffs' Property Interests**

1.      **Adjoining or Abutting Landowners**

a.      **Legal Status of Adjoining Landowners' Interest**

Most of the plaintiffs in this case are adjoining landowners whose deeds do not

specifically identify the right-of-way.  The government has moved for dismissal of these

plaintiffs' claims, arguing that because the plaintiffs' deeds do not include a description

of the right-of-way, the plaintiffs possess no property interest in the right-of-way until the

railroad right-of-way is abandoned–which under Indiana law requires authorization of rail

line abandonment by the STB.  The government asserts that this result is required by its

interpretation of an Indiana statute, which provides:

> (a) This section applies if a railroad does not own the right-of-way fee.
> (b) <u>If a railroad abandons its right to a railroad right-of-way</u>, the railroad's
> interest vests in the owner of the right-of-way fee with a deed that contains a
> description of the real property that includes the right-of-way.
> (c) If a deed described in subsection (b) does not exist, then the <u>railroad's
> interest vests in the owner of the adjoining fee</u>.  The interest of the railroad that
> vests in the owner of the adjoining fee is for the part of the right-of-way from

the center line of the right-of-way to the adjoining property line.

Ind. Code § 32-23-11-10 (emphasis added).

The plaintiffs respond by arguing that the government has misread Indiana law. They argue that although they do not have deeds that specifically include the railroad right-of-way, they are adjoining fee owners who presently own to the centerline of the right-of-way as a matter of law, subject only to the railroad easement.  They argue that this reading of the Indiana law was established in Calumet National Bank v. American Telephone & Telegraph Co., 682 N.E.2d 785, 790 (Ind. 1997).

The plaintiffs are correct that Indiana law is settled on the question of the interest adjoining property owners hold in a railroad right-of-way prior to abandonment.  In Calumet, the plaintiff was the owner of land adjoining an abandoned railroad right-of-way.  The plaintiff sought damages for trespass against a company for the unauthorized installation of fiber optic cable in the right-of-way.  The Indiana Supreme Court noted that it was confronting an issue of first impression on the issue of what interest, if any, an adjoining landowner held in railroad right-of-way where that adjoining landowner's title documents were silent as to the right-of-way.  Calumet, 682 N.E.2d at 789.  The court noted that in other jurisdictions, "absent contrary evidence, courts presume a grantor intends to convey title to the middle line of a railroad right-of-way when the grantor conveys title to property abutting such right-of-way."  Id. at 790 (citations omitted).  The court concluded that the established common law of Indiana is such that "where there is no language in any of the relevant deeds describing real property

20

that includes the right-of-way, the title of the owners of land abutting railroad

rights-of-way runs to the center of the right-of-way." Id.

The Court also explained that this common law principle is codified in the Indiana

statute that provides that when a railroad right-of-way overlying a piece of property is not

described in a deed, "the railroad's interest vests . . . in the owner of the adjoining fee. . . .

from the center line of the right-of-way to the adjoining property line." Id. at 789-90

(quoting Ind. Code § 8-4-35-5 (now codified at Ind. Code § 32-23-11-10(c))).[17]  The

Court then held with regard to the Indiana statute:

> [W]e conclude that the statute codified an established principle of common
> law: where there is no language in any of the relevant deeds describing real
> property that includes the right-of-way, the title of the owners of the land
> abutting railroad rights-of-way runs to the center of the right-of-way. . . .
> Therefore we conclude that, (I) prior to abandonment by [the railroad], the title
> of the [adjoining landowner's] predecessors-in-interest ran to the center of the
> right-of-way, subject to the burden of the railroad's easement, and (ii) upon
> abandonment, that title was no longer subject to the burden of the easement.

Id. at 790 (emphasis added).  Thus, under the holding in Calumet, the abutting

landowners in this case have a present fee interest.

This view is supported by the decision in Schmitt v. United States, 203 F.R.D. 387

(S.D. Ind. 2001), another Indiana rails-to-trails case, in which the federal district court

applying Indiana law concluded that even where a plaintiff's deed "exclude[d] the

Railroad right-of-way in its description of lands owned," the Indiana Supreme Court

---

[17]The government argues that the Indiana Code changed after Calumet was decided and therefore Calumet is not controlling.  While it is true that the Indiana statute was amended, the change to the Indiana Code is not material to this case.  The relevant language of the Indiana Code at issue in Calumet and in existence today are the same.

would be likely to find fee ownership in the abutting landowner.  <u>Schmitt</u>, 203 F.R.D. at

398-99.  That court looked not only to the <u>Calumet</u> decision, but also to Indiana's policy

disfavoring "the alienation of strips of land from abutting estates."  <u>Id.</u> at 398 (citing

<u>Brown v. Penn Central Corp.</u>, 510 N.E.2d 641, 643 (Ind. 1987); <u>Ross, Inc. v. Legler</u>, 199

N.E.2d 346, 348 (Ind. 1964) ("the alienation of [railroad rights-of-way] from . . . the

primary or parent bodies from which they are severed . . . generally operates adversely to

the normal and best use of the land"); <u>Ross v. Faust</u>, 54 Ind. 471 (1876)).

The court finds based on the Indiana Supreme Court authorities cited above that

where, as here, no known deed includes a description of the right-of-way, those

landowners holding property abutting a railroad right-of-way have a present fee interest to

the center of the right-of-way, subject to the railroad's easement.  The government's

contention that the plaintiffs in this case have no property right in the right-of-way until

the right-of-way is legally abandoned is not supported by Indiana Supreme Court

precedent.  Whether or not the easement is extinguished by abandonment, where there is

no deed saying otherwise, the abutting landowners are deemed the current fee owners

subject to the easement.  Here, the plaintiffs abutting the right-of-way are the current

owners of the fee even if the railroad has not yet abandoned the easement.

### b.      Burden of Proving Non-Existence of Other Deeds

In addition to its legal argument regarding the status of the adjoining landowners

in the right-of-way, the government also argues that these plaintiffs have failed to prove

that the portions of the railroad right-of-way in which they claim an interest are not

described in any other deed and that without this proof the plaintiffs are not entitled to claim an interest to the centerline of the right-of-way.  The government argues that these plaintiffs are not entitled to summary judgment for a taking on the grounds that they have failed to establish that they have a presently cognizable property interest in the right-of-way.

The plaintiffs argue that Indiana law does not place an evidentiary burden on the plaintiffs to prove that there is no deed existing that includes a reference to the right-of-way.  Rather, they argue, Indiana law makes clear that the relevant deeds are those conveying the property adjoining the right-of-way and that the plaintiffs need not "prove such a negative" as the non-existence of other deeds.  Pls.' Surreply 4, ECF No. 40-1.  The court agrees with the plaintiffs.

The plaintiffs are correct that Indiana law does not impose a burden on a plaintiff to prove the non-existence of any other deed including a description of the railroad right-of-way to establish an interest in the right-of-way.  Indiana law creates a presumption in favor of the adjoining landowner.  Someone challenging the adjoining landowner's interest in the fee would have the burden of showing that a deed including the right-of-way exists.  The government cannot defeat summary judgment by merely suggesting that deeds that include a reference to the right-of-way might exist.  Under RCFC 56(e)(2), the government has the obligation to submit admissible evidence to support its contention in order to defeat a motion for summary judgment.  RCFC 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely

merely on allegations or denials in its own pleading; rather, its response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial."); see generally Celotex Corp. v. Catrell, 477 U.S. 317 (1986).  Under the current RCFC 56(e)(2), if the opposing party does not so respond, "summary judgment should, if appropriate, be entered against that party."  RCFC 56(e)(2).  Absent such evidence, the court cannot say that a material fact is in dispute that prevents the court from ruling on this issue; in other words, for purposes of this motion, the plaintiffs' assertion of fact is undisputed and the plaintiffs are entitled to summary judgment.  Thus, the court finds that unless there is evidence of the existence of a deed describing the right-of-way next to an abutting landowner's property, such an abutting landowner will be presumed to be the fee owner to the center line of the right-of-way and will be entitled to damages if the right-of-way deed does not encompass recreational trail use.[18]

---

[18]As noted supra note 10, the plaintiffs are continuing to map the subject properties and complete title work.  If a deed is found that includes the right-of-way, the opposite adjoining owner will not be able to demonstrate a right to damages.

This is consistent with Rule 56(e) of the Federal Rules of Civil Procedure, which is under consideration for adoption as part of the Rules of this court, and which provides:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
> (1) give an opportunity to properly support or address the fact;
> (2) consider the fact undisputed for purposes of the motion;
> (3) grant summary judgment if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it; or
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

2.      **Landowner Separated by Road**

The government contends that one plaintiff, Bonnie Hoover, cannot recover in this case because her property is separated from the right-of-way by a road that was dedicated to the City of Peru when the subdivision she lives in was created.  The road was dedicated before she purchased her lot.  The plaintiffs argue that under Indiana law the road at issue simply imposes an additional easement on Ms. Hoover's land and does not affect her rights in the fee to the railroad right-of-way.

The defendant argues based on Poznic v. Porter County Development Corp, 779 N.E.2d 1185 (Ind. Ct. App. 2002), that the dedication of a road deprives Ms. Hoover of any ownership interest in the railroad right of way.  In Poznic the trial court held that the plaintiff was not an adjoining landowner to the railroad property because a road was located between the plaintiff's land and the railroad right-of-way.  Poznic, 779 N.E.2d at 1188.  Review of the Indiana Court of Appeals decision reveals, however, that the court did not address the road issue on appeal.  Rather, the court of appeals based its decision on the trial court finding that the railroad held the right-of-way in fee.  See id at 1189-93. The plaintiffs argue that Ms. Hoover's interest in the right-of-way is supported by Lake County Trust Co. v. Lane, 478 N.E.2d 684 (Ind. Ct. App. 1985), in which an Indiana appeals court overturned a trial court's finding that owners of land separated from a railroad right-of-way by a county road were not the adjacent and adjoining landowners to the right-of-way.  The appeals court held:

It is clear that in the absence of West Shore Drive, there would be no

25

dispute.  However, as West Shore Drive is now situated, the west edge of
Montgomerys' property and the east edge of the railroad's right of way meet
at approximately the center line of the road.

It is the law in Indiana that the owner of property whereon a public
highway lies holds the property in fee, subject only to the public's easement.
. . .

Applying this rule to the present case, there can be no doubt that the
Montgomerys are the adjacent and adjoining <u>landowners</u> to the east of the
abandoned railroad right of way.

<u>Lake Cnty. Trust</u>, 478 N.E.2d at 688 (emphasis in original) (citing <u>Magee v. Overshiner</u>,

49 N.E. 951 (Ind. 1898); <u>Terre Haute and Se. R.R. Co. v. Rodel</u>, 89 Ind. 128 (1883);

<u>Hagaman v. Moore</u>, 84 Ind. 496 (1882); <u>Bd. of Comm'rs of Vanderburgh Cnty. v.</u>

<u>Joeckel</u>, 407 N.E.2d 274 (Ind. Ct. App. 1980)).

The court finds that the <u>Lake County Trust</u> decision controls and that the existence

of a public road easement does not alter the plaintiffs' ownership rights in the right-of-

way.  While the trial court in <u>Poznic</u>, reached a different conclusion than did the appeals

court in <u>Lake County Trust</u>, the relevant portion of the trial court decision was not

addressed on appeal and the absence of an appeals court ruling means the holding in <u>Lake</u>

<u>County Trust</u> controls.  See <u>Farley v. United States</u>, 581 F.2d 821, 829 (Ct. Cl. 1978) ("In

ascertaining that state law, the federal court should look to the decisions of the highest

court of the state.  In the absence of a decision by the highest court, the decision of an

intermediate appellate state court is not to be disregarded by the federal court unless

convinced that the highest court of the state would decide otherwise.").  The court thus

finds that Ms. Hoover's rights in the railroad right-of-way, whatever they might be, are

not precluded by the presence of a public road between her property and the right-of-way,

because a road easement across her property does not affect her status as an adjoining

landowner to the right-of-way.

### 3.      Landowner Separated by Railroad-Owned Strip

In its supplemental memorandum, the government asserts that one deed reveals

that John Shields conveyed a three-foot strip of land in fee to the railroad four years after

conveying an easement to the railroad via a Release of Right of Way deed.   The

government asserts:

> The significance of the second grant of a strip of land in fee on either side of
> the right-of-way previously conveyed by John Shields is that the Railroad
> Company is the adjoining landowner for this segment of the right-of-way.  For
> this segment of the right-of-way, the only Plaintiffs who can conceivably make
> a claim are those who own land by a deed that contains a description of the
> real property that includes the right-of-way.  Indiana Code § 32-23-11-10.

Def.'s Suppl. Mem. 15, ECF No. 42-1.  The plaintiffs in their response do not dispute this

fee conveyance, but argue that, because Mr. Shields in this later conveyance granted only

a three-foot strip of land, allowing the railroad to become the abutting property owner

with the right to make a claim to the forty-feet of land to the center of the railroad

easement would be "like the tail wagging the dog."  Pls.' Resp. to Suppl. Mem. 7, ECF

No. 47.  The plaintiffs argue that the railroad would only be entitled to claim ownership to

the centerline of the right-of-way if the right-of-way "has more value to the parcel to

which it is appurtenant [the strip conveyed] than to the grantor."  Id.

As discussed above, Indiana law provides:

(a) This section applies if a railroad does not own the right-of-way fee.
(b) If a railroad abandons its right to a railroad right-of-way, the railroad's

interest vests in the owner of the right-of-way fee with a deed that contains a
description of the real property that includes the right-of-way.

(c) If a deed described in subsection (b) does not exist, then the <u>railroad's
interest vests in the owner of the adjoining fee</u>. The interest of the railroad that
vests in the owner of the adjoining fee is for the part of the right-of-way from
the center line of the right-of-way to the adjoining property line.

Ind. Code § 32-23-11-10 (emphasis added).  While the plaintiffs cite a number of Indiana

cases in support of their argument that the ordinary statutory rule applies only when the

railroad corridor "has more value" to the adjacent fee than to some other parcel, none of

the cases cited offer support to the plaintiffs' argument.[19]  The plaintiffs also cite a Texas

case in which the Texas court held, "To say that the [deed conveying the strip of land]

shall be taken not only to grant a fee, despite its attempted limitations, but also to convey

a fee half again or more greater in adjoining property, simply shocks the conscience . . . ."

<u>Haines v. McLean</u>, 276 S.W.2d 777, 786 (Tex. 1955).  If this case involved a question of

Texas law, <u>Haines</u> would be controlling and would resolve the question in the plaintiffs'

favor.  However, in the absence of a similar decision in Indiana, the court finds that the

language of Indiana Code § 32-23-11-10 controls.  This statute creates no exception for

the case in which a narrow strip of land is the adjoining fee in which the railroad's

interest vests.

---

[19] In support of their argument, the plaintiffs cite <u>Calumet</u>, 682 N.E.2d at 790 (discussed
above); <u>Richard S. Brunt Trust v. Plantz</u>, 458 N.E.2d 251, 256 (Ind. Ct. App. 1983) (holding that a
landowner's earlier conveyance of an easement lent support to finding that later conveyance also
conveyed an easement); <u>Western Union Telegraph Co. v. Krueger</u>, 74 N.E. 25, 32 (Ind. App. 1905)
(holding that landowners adjacent to public road held fee to the centerline of the road); <u>Cox v.
Louisville, New Albany & Chicago Railroad Co.</u>, 48 Ind. 178, 188 (1874) (same).  None of these
cases offers guidance on this particular question before the court.

For these reasons, the court agrees with the government that the plaintiffs holding title to land that is separated from the railroad easement by the fee granted by Mr. Shields to the railroads may not recover in this action because they have no property interest in the land underlying that railroad easement.

### 4.    Later Alleged Fee Conveyance: Powell Deeds

In its supplemental memorandum, the government also asserts that a deed reveals that in 1869 James and Catherine Powell conveyed 6.5 acres on either side of the easement they had conveyed two years earlier via a Release of Right of Way deed and that this later deed conveyed a greater estate into which the lesser estate merged. Thus, the government argues, the railroad owns in fee the land in which, prior to this 1869 conveyance, the railroad held only an easement. The plaintiffs argue that the 1869 deed conveyed an easement, not fee, to the railroad, and thus the plaintiffs remain the abutting landowners.

The 1869 deed at issue contains the following language:

> THIS INDENTURE WITNESSETH, That JAMES M. POWELL and CATHARINE POWELL, his wife . . . Convey and warrant to THE CHICAGO, CINCINNATI AND LOUISVILLE RAILROAD COMPANY . . . for the sum of One Dollar and the benefit of the location of station upon ground herein conveyed–the following real estate in Miami County in the State of Indiana, to-wit: [metes and bounds description] . . . containing only six and one-half (6 1/2) acres, more or less.

Def.'s Suppl. Mem. Ex. R, ECF No. 42-8. In support of the argument that this deed conveyed only an easement, rather than fee, to the railroad, the plaintiffs point first to the nominal amount of recited consideration. Indiana courts agree that the consideration paid

29

by a railroad may be evidence of the parties' intent to convey an easement, rather than fee. Clark v. CSX Transp., Inc., 737 N.E.2d 752, 759 (Ind. Ct. App. 2000) (citing Richard S. Brunt Trust v. Plantz, 458 N.E.2d 251, 255 (Ind. Ct. App. 1983)). "However, lack of consideration or nominal consideration alone is not sufficient cause for setting aside a deed." Id. (citing Hunter v. Milhous, 305 N.E.2d 448, 460 (Ind. Ct. App. 1973)). The Court of Appeals in Clark held that "nominal monetary consideration, alone, does not make the instrument ambiguous, nor does it create an easement." Id. (citing, e.g., Coleman v. Mo. Pac. R.R., 745 S.W.2d 622, 625 (Ark. 1988) (stating that deed which recited consideration consisting "of the benefits to accrue to the [grantors] from the building of the railway company" did not create an ambiguity in a deed conveying fee simple as such consideration "could well have been most valuable")). The deed at issue recites consideration of "the sum of One Dollar and the benefit of the location of station upon ground herein conveyed . . . ." Def.'s Suppl. Mem. Ex. R, ECF No. 42-8 (emphasis added). Because "the benefit of the location of a station" could have been valuable to the grantors, the court does not find that amount of consideration is necessarily "nominal." See Clark, 737 N.E.2d at 759; Coleman, 745 S.W.2d at 625. Further, even if this consideration truly is nominal, it is only one piece of evidence suggesting an intent to convey an easement, rather than fee.

The plaintiffs next point to the reference of the use as a "station," calling this reference a "limitation on the railroad's use of the property." The court does not agree that the reference to the station as consideration is the same as a limitation on the

railroad's use.  Indeed, the deed contains no reference to limitations on the use of the

property conveyed.  Further, unlike deeds that the parties agree in their stipulations

conveyed only an easement because of references to a "right-of-way," this deed makes no

mention of conveyance of a "right" or "right-of-way."  Rather, the deed purports to

convey 6.5 acres of "real estate."

For these reasons, the court agrees with the government that the 1869 deed

conveyed a fee to the railroad.  Accordingly, the plaintiffs may not now make a claim for

a taking with respect to land abutting the Powell deed.

### D.    Scope of the Railroad Easements

Having resolved the threshold issues regarding whether certain plaintiffs have any

property interest subject to a possible taking, the court moves on to the question of

whether the scope of the easements granted to and held by the railroad encompass use as

a recreational trail pursuant to the Trails Act.  The Supreme Court acknowledged in

Preseault I that "under any view of takings law, only some rail-to-trail conversions will

amount to takings. . . . [Some rights-of-way] are held as easements that do not even as a

matter of state law revert upon interim use as nature trails."  Preseault I, 494 U.S. at 16

(noting, "Some state courts have held that trail use does not constitute abandonment of a

right-of-way for public travel so as to trigger reversionary rights.").  Whether a particular

conversion effects a taking depends on the language of the deeds at issue and the law of

the relevant state.  See id. at 20 ("[S]tate law determines what property interest petitioners

possess . . . .").

31

The courts of numerous states have found no compensable taking in the rails-to-trails context, including Pennsylvania, <u>Moody v. Allegheny Valley Land Trust</u>, 976 A.2d 484 (Pa. 2009); Maryland, <u>Chevy Chase Land Co. v. United States</u>, 733 A.2d 1055 (Md. 1999); Minnesota, <u>State by Washington Wildlife Preservation, Inc. v. State</u>, 329 N.W.2d 543 (Minn. 1983); and Ohio, <u>Rieger v. Penn Central Corp.</u>, No. 85-CA-11, 1985 WL 7919 (Ohio App. 1985).  Courts applying the law of other states, including Vermont, <u>Preseault II</u>, 100 F.3d 1525; Washington, <u>Lawson v. Washington</u>, 730 P.3d 1308 (Wash. 1986); Wisconsin, <u>Pollnow v. State Department of Natural Resources</u>, 276 N.W.2d 738 (Wisc. 1979); Missouri, <u>Glosemeyer v. United States</u>, 45 Fed. Cl. 771 (2000); and Florida, <u>Rogers v. United States</u>, 90 Fed. Cl. 418 (2009), have found the opposite.  Here, the court is mindful that a federal district court applying Indiana law found that the conversion of track to trail constituted a taking where the right-of-way easement at issue was limited to use for railroad purposes.  <u>Schmitt v. United States</u>, No. IP 99-1852-Y/S, 2003 WL 21057368 (S.D. Ind. March 5, 2003).

The court will analyze the various types of conveyances at issue in this case in the context of Indiana law to determine which, if any, of the easements are sufficiently broad to encompass within the permissive uses use as a recreational trail.

### 1.    General Principles of Deed Interpretation under Indiana Law

In Indiana, railroad easements may be acquired via private grants by the fee owner of the property, by condemnation, or by prescription.  <u>See</u> <u>Brown</u>, 510 N.E.2d at 643; <u>Hoffman v. Zollman</u>, 97 N.E. 1015 (Ind. 1912).  When interpreting a deed, the object of

deed construction is to ascertain the intent of the parties to a deed.  <u>Clark</u>, 737 N.E.2d at

757 (citing <u>Brown</u>, 510 N.E.2d at 643).  In construing a deed, Indiana courts consider the

deed in its entirety so that no part is rejected.  <u>Tazian v. Cline</u>, 686 N.E.2d 95, 97 (Ind.

1997).  The deed is to be interpreted so that all parts of it are reconciled and the deed does

not contradict itself.  <u>Ross</u>, 199 N.E.2d at 348.  That said, courts are constrained by the

"four corners" rule:

> [T]he language of the instrument, if unambiguous, determines the intent of the instrument such that parol or extrinsic evidence is inadmissible to expand, vary, or explain the instrument unless there has been a showing of fraud, mistake, ambiguity, duress or undue influence.  Even if ambiguity exists, extrinsic evidence is only admissible to explain the instrument and not contradict it.

<u>Lippeatt v. Comet Coal and Clay Co., Inc.</u>, 419 N.E.2d 1332, 1335 (Ind. Ct. App. 1981);

<u>see also</u> <u>Clark</u>, 737 N.E.2d at 757-58.  The <u>Clark</u> court further explained:

> Deeds generally contain three important clauses: the granting clause, the habendum clause, and the descriptive clause.
> . . .
> The habendum clause may modify or limit the grant, but it does not defeat a clear, unambiguous grant. . . .  It is generally held that if there are any inconsistencies between the granting clause and the habendum clause, the granting clause will prevail because the granting clause is "the most dependable expression of the grantor's intention" and "is considered to be the very essence of the deed."

<u>Clark</u>, 737 N.E.2d at 758 (quoting <u>Long v. Horton</u>, 133 N.E.2d 568, 570-71 (Ind. App.

1956); citing <u>L. & G. Realty v. Indianapolis</u>, 129 N.E.2d 580, 585 (1957)).  The court

must also consider the deed in the context of the law in force at the time of the

conveyance.  <u>Id.</u> at 758-59 (citing <u>Tazian</u>, 686 N.E.2d at 98; <u>Consol. Rail Corp. v.</u>

Lewellen, 682 N.E.2d 779, 781 (Ind. 1997)).

## 2.    Release of Right of Way Deeds

As noted above, the most common form of deed at issue in this case includes language indicating the conveyor does "release, relinquish forever, quit claim and convey . . . the Right of Way . . to [the railroad]."  The government contends that these deeds create an easement for all travel through the servient estates.  Def.'s Mot. Summ. J. 33, ECF No. 33-1 (citing Cincinnati, Indianapolis, St. Louis. & Chicago Ry. Co. v. Geisel, 21 N.E. 470 (Ind. 1889)).  The government notes that these deeds state that the easement is granted for the "purpose of facilitating the construction and completion of" a railroad, but argues that because the deeds place no restriction on the use of the "road" once constructed and contain no language restricting transportation on the right-of-way to rail travel, the easements should be construed as allowing recreational trail use.  The government argues that railbanking and use as a recreational trail fall within the "essential nature" of the right-of-way conveyed.  The government distinguishes these deeds from the later described "Railroad Purposes" deeds, arguing that the lack of limiting language also demonstrates that these deeds are broad enough to encompass trail use.  The plaintiffs contend that the subject deeds conveyed right-of-way easements limited to railroad purposes only, which, they argue, does not include railbanking or use as a recreational trail under Indiana law.

As described above, the Release of Right-of-Way deeds contain the following operative language:

Release of Right of Way

  [Named Landowner] . . . for and in consideration of [variable amounts of consideration] . . . and the advantages which may or will result to the public in general and myself in particular by the <u>construction of the Chicago, Cincinnati & Louisville RailRoad</u> as now surveyed or as the same may finally be located and <u>for the purpose of facilitating the construction and completion of said work</u>, do hereby for myself, my heirs, executors, administrators and assigns, <u>release, relinquish forever, quit claim and convey</u> to the Chicago, Cincinnati, & Louisville Railroad Company and assigns the <u>Right of Way</u> [varying width] for so much of said road as passes through or over the following real estate . . . to wit:

  Being part of [quarter, township, range description of land over which right-of-way runs].

  And I further hereby release and relinquish to the Said RailRoad Company all assigns all damages all rights of damages actions and causes of action whatever which I might sustain or be entitled to by reason of anything connected with consequent upon or growing out of the location or construction of said road or the repairing thereof where finally established and completed.

(Emphasis added).

The government analogizes these deeds to the deeds that were at issue in <u>Moody</u> and <u>Chevy Chase,</u> wherein the Pennsylvania and Maryland courts, respectively, held that the right-of-way deeds at issue in those cases were broad enough to encompass any "road" use, including recreational trail use.  See <u>Moody</u>, 976 A.2d at 490-91; <u>Chevy Chase</u>, 733 A.2d at 1073.

Regarding the deed at issue in that case, the <u>Moody</u> court explained:

The deed that created the easement at issue referred to it as a "right of way," and contained the following habendum clause: "To have and to hold the said rights and privileges to the use of [Conrail], so long as the same shall be required for the use and purposes of said Road, in as full, perfect and ample a manner as may be necessarily required for the purposes hereby intended."

<u>Moody</u>, 976 A.2d at 490-91 (footnote omitted).  Relying on the use of the word "Road" in

the habendum clause, which it found to be defined as, "'[a]n open, generally public way for the passage of vehicles, people, and animals,' '[t]he surface of a road; a roadbed,' '[a] course or path,' or 'a railroad,'" id. at 491 (citing The American Heritage Dictionary of the English Language (4th ed. 2000)), the court concluded, "Fundamentally, the deed and its habendum clause create an easement to allow travel through the servient estates." Id. The court also relied upon the remainder of the habendum clause, which allowed the easement holder to conduct construction and maintenance on the right-of-way, to construct aqueducts, pipes, and drains, and to bring materials onto the property for those purposes. The court also found significant the fact that the deed did not contain any language stating that the easement would terminate upon cessation of rail service. Id. For these reasons, the Pennsylvania court found that recreational trail use was not outside the scope of the original easement and that cessation of rail service was not equivalent to abandonment of the right-of-way created by the deed. Id.

Similarly, in Chevy Chase, the Maryland court explained:

No language in the deed in the instant case suggests that the right-of-way was limited to railroad purposes only . . . . The deed conveyed a "free and perpetual right of way." The use of the terms "free" and "perpetual" provide a clear indication that few, if any, conditions were intended to be placed on the railroad's use of the right-of-way. "[F]ree" is defined as " [n]ot [being] subject to [the] legal constraint of another." Black's Law Dictionary 663 (6th ed. 1990). The use of the term "perpetual" clearly indicates that the easement was intended to be of indefinite duration and, particularly when combined with the term "free," suggests that the use of the easement was to be dynamic, i.e., adaptable to the evolving circumstances and transit needs of those intended to benefit from the right-of-way–in particular the general public whom the land company was attempting to attract to the areas served by the railroad. The language making the easement transferable to "successors and assigns" further

supports a broad construction of the deed language.

. . .

Unlike many of the grants of easements that we have addressed in the past, the deed in the instant case does not suggest any limit on the use of the right-of-way.  It is clear that a right of passage was granted, and, as noted above . . . the circumstances clearly indicate that the original instrumentality was a railroad.  But nowhere in the granting clause or elsewhere in the deed does the language suggest that a railroad was the only instrumentality for use of the perpetual right-of-way.  For example, nowhere does language "for railroad purposes" appear, and there are no other express limitations on the use of the right-of-way.

Chevy Chase, 733 A.2d at 1073.  The court distinguished cases in which easements had been specifically designated as being for railroad purposes.

Although the Moody and Chevy Chase decisions have no precedential value in Indiana, because the Indiana Supreme Court has not yet ruled on the scope of these types of deeds, this court has looked carefully at the Moody and Chevy Chase decisions and has determined that the Release of Right of Way deeds at issue in this case are different from the deeds at issue in those cases and therefore compel a different outcome.  First, the Release of Right of Way deeds at issue in this case contain the following phrase: "for the purpose of facilitating the construction and completion of [the Chicago, Cincinnati & Louisville RailRoad]."  No such statement of purpose was apparent in the deeds at issue in either Moody or Chevy Chase.  The court in Chevy Chase specifically distinguished from the case before it cases in which deeds suggested a limitation on the designated purpose of the right-of-way.  See id. at 1073.  Second, the court does not agree with the government that the absence of language placing any restriction on the use of the "road" once constructed is controlling.  The court finds that under Indiana law right-of-way

37

deeds to railroads generally convey a narrow, rather than broad, set of allowed uses of the right-of-way.  See Cincinnati, Indianapolis, St. Louis. & Chicago Ry., 21 N.E. 470 (holding that a deed containing virtually identical language conveyed a right-of-way easement for railroad purposes, rather than fee, to the railroad).  In addition, it is clear under Indiana law that to the extent the language in the deeds is not specific as to its meaning, "the general rule as variously stated is that the grantee is entitled to, and only to, such a way as is reasonably necessary and convenient for the purposes for which it was created."  McCauley v. Harris, 928 N.E.2d 309, 315 (Ind. Ct. App. 2010) (emphasis added) (quoting 28A C.J.S. Easements § 198 (2008); citing Murat v. S. Bend Lodge No. 235 of Benev. & Protective Order of Elks of U.S., 893 N.E.2d 753, 756 (Ind. Ct. App. 2008)).  Thus, Indiana law presumes a narrow, rather than broad, reading of railroad easements.

The court finds that the decisions in Chevy Chase and Moody are also distinguishable on other grounds.  The deeds in Chevy Chase included the words "free," and "perpetual."  Chevy Chase, 733 A.2d at 1073.  The Chevy Chase court relied the inclusion of these words in construing the easement as one without limitations.  Id. Without question, the deeds at issue here contain the phrase, "relinquish forever," but the words "relinquish forever" must be read in the context of the earlier phrase, "for the purpose of facilitating the construction and completion of said work."  Indiana law requires the court to construe the deed in context.  See Ross, 199 N.E.2d at 347-48. Similarly, the Moody court interpreted the word "road" in the deed at issue as having a

very broad definition, not limited to "railroad."  Moody, 976 A.2d at 491.  Here, the deeds

at issue also contain the word "road" in the habendum clause, which states:

> And I further hereby release and relinquish to the Said RailRoad Company all
> assigns all damages all rights of damages actions and causes of action
> whatever which I might sustain or be entitled to by reason of anything
> connected with consequent upon or growing out of the location or construction
> of said road or the repairing thereof where finally established and completed.

However, the word "road" also must be read in the broader context of the deed, which

makes clear that "said road" refers to "the Chicago, Cincinnati & Louisville RailRoad."

Because Indiana law requires a court to consider a deed in its entirety so that no part is

rejected, Tazian, 686 N.E.2d at 97, all parts of it are reconciled, and it does not contradict

itself, Ross, 199 N.E.2d at 348, the court declines to follow the Maryland and

Pennsylvania courts in construing the present deeds.  Here, the court finds that references

to "relinquish forever" and use of the word "road" in the present deeds cannot be

divorced from the deeds' railroad use context.[20]

---

[20]Indeed, the dissent in Moody states regarding this issue:

> Moreover, while the relevant instruments of conveyance are not models of clarity, the
> references to "Road" are to a particular road (via the use of the phrases "said Road"
> and "the Road"), commencing immediately after the identification of "Allegheny
> Valley Rail Road Company."  Certainly, it is at least a reasonable interpretation that
> the reference "said Road" is to the Rail Road that is the subject of Allegheny Valley
> Rail Road Company's business, since no other references to any other "road" appear
> on the face of the instrument.  Moreover, the instruments enable "the Company to
> construct and repair the Road, and the right to conduct and carry water by aqueducts
> and pipes, and the right to make proper drains."  It is difficult to envision that
> property owners would have foreseen a railroad company coming onto their property
> to construct and repair a recreational trail for hikers and bicyclists as opposed to a
> railroad.

Having construed these deeds under Indiana law as limiting the right-of-way to construction of and use as a railroad and not as a "road" encompassing a recreational trail, the question remains whether railbanking and interim use as a recreational trail fit within the specific language of these conveyances that limit the easements to use for railroad purposes. The Federal Circuit considered this question in the context of Vermont law and the "railroad purpose" easements in <u>Preseault II</u>. There, the deeds did not contain language restricting the use of the right-of-way, but incorporated the purposes specified in the railroad's incorporation act: "receive, take, hold, purchase, use and convey such real and personal estate as is necessary or proper in the judgment of such corporation, for the construction, maintenance and accommodation of such railroad as aforesaid, and its structures and appurtenances, and as the purposes of the corporation may require . . . ." <u>Preseault II</u>, 100 F.3d at 1541. In the absence of a Vermont case specifically on point, the Circuit looked to general law on the scope of easements. The Circuit noted that despite the general rule that the precise language employed to create an easement governs the extent of permissible uses, the scope of an easement may be "adjusted in the face of changing times <u>to serve the original purpose</u>, so long as the change is consistent with the terms of the original grant." <u>Id.</u> at 1542 (emphasis in original) (citing 3 Richard R. Powell, <u>Powell on Real Property</u> § 34.12[2] (Patrick J. Rohan ed., 1996) ("It is often said that the parties are to be presumed to have contemplated such a scope for the created

_____

<u>Moody</u>, 976 A.2d at 671 (Saylor, J. concurring-in-part, dissenting-in-part).

easement as would reasonably serve the purposes of the grant. . . . This presumption often allows an expansion of use of the easement, but does not permit a change in use not reasonably foreseeable at the time of establishment of the easement.")).  Regarding the question of whether the changed use at issue served the purposes of the original grant, the Circuit stated:

> When the easements here were granted to the Preseaults' predecessors in title at the turn of the century, specifically for transportation of goods and persons via railroad, could it be said that the parties contemplated that a century later the easements would be used for recreational hiking and biking trails, or that it was necessary to so construe them in order to give the grantee railroad that for which it bargained?  We think not.  Although a public recreational trail could be described as a roadway for the transportation of persons, the nature of the usage is clearly different.  In the one case, the grantee is a commercial enterprise using the easement in its business, the transport of goods and people for compensation.  In the other, the easement belongs to the public, and is open for use for recreational purposes, which happens to involve people engaged in exercise or recreation on foot or on bicycles.  It is difficult to imagine that either party to the original transfers had anything remotely in mind that would resemble a public recreational trail.

Id. at 1542-43.  Thus, the Circuit concluded that the easements at issue could not be interpreted under Vermont law–and, more generally, traditional common law–to include within their scope use as a recreational trail.

While the Indiana Supreme Court has not expressly examined the question of whether a change from railroad to recreational trail use is permitted by a railroad purpose easement, Indiana does possess an instructive body of law on whether changed uses are consistent with easements in other contexts.  The federal district court in Schmitt analyzed this law in concluding that railroad purpose easements are limited to the

operation of railroads.  See Schmitt, 2003 WL 21057368 at *7.  The court looked first to

cases where the railroad's use was deemed to be outside the right-of-way easement.  See

id. (citing Smith v. Holloway, 24 N.E. 886 (Ind. 1890) (railroad whose grant of

right-of-way was grant of easement could not interfere with flow of stream across

easement); Julien v. Woodsmalls, 82 Ind. 568 (1882) (railroad had no right to cut and sell

ice from right-of-way because ice belonged to fee owner); Pittsburgh, Ft. Wayne &

Chicago R.R. v. Swinney, 97 Ind. 586 (1884) (removal and sale of gravel and sand from

railroad right-of-way was abuse of "license" to use the land); Cleveland, Cincinnati,

Chicago & St. Louis Ry. Co. v. Simpson, 182 Ind. 693 (1914) (railroad cannot excavate

on right-of-way so as to cause fee owner's coal mine to collapse)).  The court then looked

to a case where uses of railroad easements were found to be within the scope of the

limitations.  Id. (citing Pittsburgh, C. C. & St. Louis Ry. v. Lamm, 112 N.E. 45 (Ind. App.

1916) (railroad could change grade of a roadbed because the improvement did not

constitute an additional burden above that which was included in the original

appropriation).  The court concluded that "In Indiana, railroad purpose easements have

been construed to mean that a railroad holds the right to operate its trains thereon and

conduct business consistent with such operations, but may not exceed the scope of such

purposes."  Schmitt, 2003 WL 21057368 at *7.[21]

---

[21]This conclusion is consistent with the Indiana Appeals Court's holding in Timberlake, Inc. v. O'Brien, 902 N.E.2d. 843 (Ind. Ct. App. 2009), that although a non-railroad entity may hold a railroad right-of-way, its use of the right-of-way is limited to the purposes set forth in the original deed conveying the easement.  Timberlake, 902 N.E.2d at 853.  In that case, the original conveyance allowed for the railroad company to "pass and repass by themselves, their servants,

In addition to the cases cited in <u>Schmitt</u>, the plaintiffs rely on <u>Cox v. Louisville, New Albany & Chicago Railroad Co.</u>, 48 Ind. 178 (1874), in which the Indiana Supreme Court examined whether railroad use fit within the scope of a easement originally created and used for a public street.  In concluding that one use could not be substituted for another, the Court stated: "The travel on [railroads] bears no analogy to our notions of travel on an ordinary street or highway, where every one travels at pleasure in his own conveyance, without paying tolls or fares.  The uses are totally different and even inconsistent." <u>Cox</u>, 48 Ind. 178 (internal quotation marks and citation removed).

The government notes, however, that the Indiana Supreme Court has determined that not all additional uses are outside the scope of public road easements.  The Indiana Supreme Court has held that public utilities may use public rights-of-way for laying pipe or utility lines.  <u>See, e.g.</u> <u>Fox v. Ohio Val. Gas Corp.</u>, 235 N.E.2d 168 (Ind. 1968) (gas company could lay pipe under public road without consent from underlying fee owner); <u>Ritz v. Ind. & Ohio R.R.</u>, 632 N.E.2d 769, 775-76 (Ind. Ct. App. 1994) (utility may use the public railroad right-of-way without the consent of the servient landowner where "[n]o additional burden is cast upon the fee beyond that which was contemplated and paid for in the original taking" (citing <u>Fox</u>)).

Based on these authorities and the general rules regarding the construction of

---

agents and employees with their engines, cars, horses, cattle, carts, wagons and other vehicle, and transport freight and passengers, and do all other things properly connected with or incident to the location, building, maintaining and servicing the [Railroad Property]"; the court held that when the railroad conveyed the easement by quitclaim deed more than a century later, use of the easement was limited to those purposes.  <u>Id.</u> at 853.

easements in Indiana, the court finds that Indiana law is such that a railroad right-of-way easement is not so broad as to allow for substitution of recreational trail use for rail use. The substitution of trail use for rail use makes this case closer to the precedent set by the Indiana Supreme Court in Cox than its ruling in Fox. In Cox, the Indiana Supreme Court ruled that it would not allow for a new and inconsistent use to be substituted in a right-of-way without payment. In contrast, the Indiana Supreme Court's decision in Fox, which allowed for an additional (not substitute) use, rested on its reasoning that new use of technology that is in line with the purpose of the dedication, is consistent with the existing use, and imposes no additional burdens is within the scope of a public right-of-way easement:

> With the growth of population, advancement of commerce and new inventions, society must adjust itself from existing conditions to growing and changed conditions and specifically to new means of transportation. A dedication of land for highway purposes when made is deemed to comprehend not only specific uses in the minds of the parties at the time, but also those developed and invented, which fall into the category of transportation in the future. Industry has found it more feasible, for example, to move oil or gas through pipe lines in many instances, rather than by truck on the surface along the highways. Courts must recognize these advances in the science of transportation.

Fox, 235 N.E.2d at 172-73. The substitution of rail use for recreational trail use in this case, however, is not a technologically advanced transportation use. To the contrary, walking along a trail is the oldest form of human transportation, and could have been, but apparently was not, a use contemplated by the parties to the original conveyances.

In this connection, the court also finds that the change from railroad traffic to foot

traffic is wholly dissimilar to the situation where a utility lays line or pipe next to an operating rail line.  In the latter situation, the owner of the underlying fee could hardly be said to have taken on a different or heightened burden because of the additional use where rail use is ongoing.  In the former situation, the landowner's fee is burdened in a manner fundamentally different from the bargained-for use; the bargained-for use is absent.  See Toews v. United States, 53 Fed. Cl. 58, 62 (2002) (citing Pollnow, 276 N.W.2d 1979).

Nor is the defendant helped by its argument that railbanking may be deemed a railroad purpose.  The Federal Circuit explained in Preseault II that such a consideration is irrelevant to the question of whether a taking has occurred: "The fact that restoration of [a] portion of the line would be technically feasible tells us little.  The question is not what is technically possible to do in the future, but what was done in the past."  Preseault II, 100 F.3d at 1547.  The taking arises because recreational trail use does not fall within the scope of the original railroad easement.  Ladd, 630 F.3d at 1019.  It is for this reason that the court does not agree with the defendant's argument that Indiana statutes passed in the last several decades that in effect define railbanking as a railroad purpose have an effect on the outcome of the taking issue in this case.  The cited statutes provide, "A right-of-way is not considered abandoned if: (1) rail service continues on the right-of-way; or (2) the railroad has entered into an agreement preserving rail service on the right-of-way," Ind. Code § 32-5-12-6(b); "A right-of-way is not considered abandoned if the [STB] imposes on the right-of-way a trail use condition under 16 U.S.C. [§] 1247(d)," id. § 32-5-12-7; and "A railroad may discontinue rail service on the

45

right-of-way without abandoning the right-of-way," id. § 32-5-12-8(b).  The Federal

Circuit addressed a similar argument by the government in the context of a similar

Vermont statute:

> A final argument made by defendants is based on a 1982 state statute
> which authorizes, indeed instructs, the State to retain any unused railroad
> rights-of-way it owns for future transportation uses, and in the meantime to use
> them for other public purposes not inconsistent with future transportation
> purposes.  That is what the State purports to have done, and presumably would
> have done with or without the statute.  Defendants argue that the statute makes
> the action proper.
>
> One can hardly fault the State government for complying with its law.
> However, the statute does not say that such actions are without consequences
> to the property owners, nor does it say that the property owners will not, or
> must not, be compensated for such actions.  The statute is in fact wholly silent
> on the question of compensation.  Obviously the State could not simply by
> enactment of a statute immunize itself from the salutary provisions of the Fifth
> Amendment.  The issue is not whether the State or Federal governments had
> the power or obligation to do what they did, but whether the Constitution
> requires that just compensation be paid as a consequence.  The existence of the
> statute thus adds nothing to the Government's defense.

Preseault II, 100 F.3d at 1551-52 (internal footnotes and citations omitted).  Preseault II is

not distinguishable from the case at bar.  The Indiana statutes were not in effect at the

time of the conveyances and so have no relevance to the understanding of the original

parties to the conveyance.  See Clark, 737 N.E.2d at 758-59 ("in construing a deed, the

court considers the instrument relative to the statutes in effect at the time of the

conveyance.") (citing Tazian, 686 N.E.2d at 98; Consol. Rail Corp., 682 N.E.2d at 781).

And, while the statutes may prevent the abandonment of railroad rights-of-way converted

to recreational trails, they cannot protect against the constitutional requirement that just

compensation be paid in the event of a taking of property.  See Preseault II, 100 F.3d at

1551-52.  Indiana may no more immunize itself from the Fifth Amendment than could

Vermont.

In sum, for the reasons discussed above, the court finds that the Release of Right

of Way deeds in this case conveyed an easement that allowed only for the operation of a

rail line and that these railway easements did not encompass use of the property as a

recreational trail.  Interim trail use authorized by the NITU is not within the scope of the

easements conveyed in the above-described instruments.

### 3.      Hakins, Hurst, and Schindler Deeds

The court next looks to whether the three deeds the defendant has characterized as

"Moody" deeds–the Hakins deed, the Hurst deed, and the Schindler deed–convey

easements limited to use for railroad purposes or whether, as the defendant contends, they

convey either a general purpose easement or an easement for travel of all kinds.[22]  These

deeds are similar to but in a form distinct from the Release of Right of Way deeds.  The

three deeds are examined in turn below.

### a.      Hakins Deed

The Hakins deed is on a pre-printed form with handwritten modifications and

provides:

---

[22]The government did not initially distinguish these three deeds from the Release of Right
of Way or Railroad Purposes deeds.  However, in its memorandum regarding original deeds, the
government distinguished these three deeds, arguing that they were closer in form to the deed at
issue in <u>Moody</u> than are other deeds in this case.  <u>See</u> Def.'s Suppl. Mem. 11-13, ECF. No. 42-1.
Regardless, the government argues that these deeds conveyed no more restrictive an easement
than did the Release deeds.

> George Hakins and his wife Jane Hakins <u>in consideration of the location and construction of the Chicago Cincinnati & Louisville RAILROAD</u> and Fifty dollars . . . paid by the Chicago Cincinnati & Louisville RAILROAD COMPANY . . . DO <u>GIVE, GRANT, BARGAIN, SELL AND CONVEY to said Company the Right of Way for use of the Railroad of said Company</u> over and across [the described property] for the width or space of forty feet on each side of the center line of said Road, as now and as may be hereafter located, and for the length the distance between the limits of said tract, to include also the right of said Company to take materials, except timber, for the construction and repairs of said Road, at any point within forty feet of said line, together with <u>the Right of Way over said tract sufficient to enable said Company to construct and repair its Road</u>, and the right to conduct water by aqueducts, and the making of proper drains. <u>To have and to hold the said Rights and Privileges to the use of said Company, so long as the same shall be required for the use and purposes of said Road</u>, in as full, perfect and ample a manner as may be required for that purpose.

Def.'s Suppl. Mem. Ex. M, ECF No. 42-7 (emphasis added).

The court finds, as it did in the case of the Release of Right of Way deeds, that this deed conveyed an easement for railroad purposes. The court finds most instructive the inclusion of the phrases, "<u>for use of the Railroad of said Company</u> . . . [t]o have and to hold the said Rights and Privileges to the use of said Company, <u>so long as the same shall be required for the use and purposes of said Road</u>." <u>Id.</u> (emphasis added). The court finds, as it did in the case of the Release deeds, that this language limited use of the easements to railroad purposes. The limiting clause "for the use and purposes of said Road" clearly refers to "the Railroad of said Company." For these reasons, the court once again declines to follow the Pennsylvania court's holding in <u>Moody</u> that "said Road" might refer to anything other than a railroad. Further, the court again notes that to the extent the language in the deeds is not specific as to its meaning, "the general rule as

variously stated is that the grantee is entitled to, <u>and only to</u>, such a way as is reasonably

necessary and convenient for the purposes for which it was created." <u>McCauley</u>, 928

N.E.2d at 315 (emphasis added; citations omitted).

Having found above that recreational trail use is not within the scope of an

easement thus limited, the court finds that recreational trail use is outside the scope of the

easement created by the Hakins deed.

> **b.**    **Hurst Deed**

The Hurst deed is similar to the Hakins deed although it does not use the same pre-

printed form.  It provides:

> I. B. Hurst . . . in consideration of one hundred and fifty (150) dollars . . . paid
> by the Chicago, Cincinnati and Louisville Railroad Company . . . does give,
> grant, bargain, sell and convey to said Company the right-of-way over and
> across the northwest quarter of the northeast quarter of section 19, township
> 29, range 4 . . . for a width or space of eighty feet (or 40 on eac[h] side of the
> center line of said road as now located) and of length the distance between the
> limits of said tract; to include also the right of said Company to take materials
> except timber for the repair of said line, and the right to conduct water by
> aqueducts and the right of making of proper drains.
> <u>To have and to hold the said rights and privileges to the use of said</u>
> <u>Company so long as the same shall be required for the use and purposes of said</u>
> <u>road</u> in as full and perfect and ample a manner as may be required for that
> purpose.

Def.'s Suppl. Mem. Ex. N, ECF No. 42-7 (emphasis added).

Like the Hakins deed, the Hurst deed contains the phrase, "To have and to hold the

said rights and privileges to the use of said Company <u>so long as the same shall be required</u>

<u>for the use and purposes of said road</u>." <u>Id.</u> (emphasis added).  However, unlike the

Hakins deed, there is no previous reference to the railroad other than in the context of

payment.  There is no reference to construction of a railroad nor to a railroad as

consideration for the conveyance.  As such, the court finds that the reference to "said

road" in the deed renders the instrument ambiguous as to its scope.  Indiana courts have

held that where ambiguity exists, extrinsic evidence is admissible to explain the

instrument.  See Lippeatt, 419 N.E.2d at 1335; see also Clark, 737 N.E.2d at 757-58.  In

this case, it is clear that the recipient of the easement was a railroad company and that the

railroad company would be using the easement for the laying of track.  In other words, the

"road" mentioned in the deed was a railroad, not a road for types of vehicles other than

trains.  Given the general Indiana rule that a "grantee is entitled to, and only to, such a

way as is reasonably necessary and convenient for the purposes for which it was created,"

McCauley, 928 N.E.2d at 315 (emphasis added), this court finds that the recipient of the

easement, a railroad company that acquired an easement over the Hurst property in

conjunction with its much broader acquisition of a rail corridor, was limited to using the

easement created by the Hurst deed for railroad purposes; trail use exceeds the scope of

the permitted uses.

c.    **Schindler Deed**

The Schindler deed is on a pre-printed form and provides:

William Schindler and Margaret J. Schindler, his wife . . . in consideration of
the sum of ($1.00) One dollars . . . paid by The Lake Erie & Western Railroad
Company . . .do hereby grant, release, convey and warrant to said The Lake
Erie & Western Railroad Company, for the purpose of constructing its said
Railroad, the right of way (80) eighty feet in width, that is to say (40) forty feet
wide on each side of the center line of its said Railroad, as the same is now
located and constructed across [the described land] with the right to construct,

50

<u>operate and maintain a Railroad and all necessary appurtenances,</u> across and upon the land above designated, together with the right to use all materials necessary in such construction and maintenance which are included in the land hereby conveyed.

<u>To have and to Hold The above granted premises, rights and privileges, for the uses and purposes above mentioned,</u> to said The Lake Erie & Western Railroad Company, its successors and assigns forever.

Def.'s Suppl. Mem. Ex. O, ECF No. 42-7.

Like the Hakins deed, the court has determined that this deed conveyed an easement for railroad purposes. The court finds most instructive the inclusion language indicating that the conveyance was "<u>for the purpose of constructing its said Railroad</u> . . . with the right to construct, operate and maintain a Railroad and all necessary appurtenances . . . . To have and to Hold The above granted premises, rights and privileges, <u>for the uses and purposes above mentioned</u>." <u>Id.</u> (emphasis added). The court finds that this language indicates an intent to limit use of the easements to construction and operation of a railroad.

Having found above that recreational trail use is not within the scope of an easement thus limited, the court finds that recreational trail use is outside the scope of the easement created by the Schindler deed.

### 4. Railroad Purposes Deeds

The final category of deeds at issue is the most clear-cut in this case. The government agrees that three deeds–the Railroad Purposes Gould deed, the Brower deed, and the Pense deed–conveyed a right-of-way limited to railroad purposes. The government argues, however, that railbanking and interim use as a recreational trail are

within the scope of rights-of-way for railroad purposes.

The operative language of the Gould deed provides:

Release of Right of Way
James Gould . . . .
For and in consideration of Two hundred dollars . . . and the advantages which may or will result to the public in general and myself in particular, by the construction of the Chicago, Cincinnati & Louisville RailRoad as now surveyed, or as the same may finally be located and <u>for the purpose of facilitating the construction and completion of said work</u>, do hereby for myself, my heirs, executors, administrators and assigns, release, relinquish forever, quit claim and convey to the Chicago, Cincinnati, and Louisville Railroad Company and assigns the Right of Way Eighty feet in width for so much of said road as passes or may pass through or over the following real estate . . . to wit:
Being part of the Fractional North East quarter of Section number (2) Two of Township Number (29) Twenty -nine, North of Range (3) Three East.
And I further hereby release and relinquish to the Said RailRoad Company and assigns, all rights of damages, whatever, which I may have sustained by measure of anything connected with location or construction of said Road.
. . .
<u>When said land herein released Shall cease to be used for Rail Road purposes, it shall revert back to the original tract.</u>

<u>Id.</u> Ex. I, ECF No. 42-5 (emphasis added).

The operative language in the Pence deed provides:

Release of Right of Way
I, John Pence . . . for and in consideration of the benefits that may accrue to me from the construction of the RailRoad and of the advantages which may or will result to the Public in General and myself in particular by the Construction of the Chicago Cincinnati & Louisville RailRoad as now surveyed or as the same may finally be located and <u>for the purpose of facilitating the Construction and Completion of Said Work</u> do hereby for myself my heirs executors administrators and assigns release relinquish forever Quit-Claim and Convey to the Chicago Cincinnati, & Louisville RailRoad Company and assigns the Right of Way Sixty-six feet in width for So much of Said Road as passes or may pass through or over the following Real Estate .

52

. . to wit:  Being part of the North East quarter of the North East quarter of Section o 21 of Township No 30 North & Range No 3 East.  <u>Said land 66 feet wide to be held and enjoyed by Said RailRoad Company So long as it shall be used for a Rail Road & no longer.</u>  And I further hereby release and relinquish to the Said RailRoad Company all assigns all damages all rights of damages actions and causes of action whatever which I might sustain or be entitled to by reason of anything connected with consequent upon or growing out of the location or construction of Said Road or the repairing thereof when finally established and completed.

<u>Id.</u> Ex. J, ECF No. 42-5 (emphasis added).

The operative language of the Brower deed provides:

This Indenture Witnesseth, That George Brower . . . CONVEY AND WARRANT to the Chicago Cincinnati & Louisville Railroad Company . . .for the sum of one hundred and fifty dollars . . . The Right of Way over the following REAL ESTATE in Miami County, in the State of Indiana to-wit: <u>So long as said Company may use the same for Railroad purposes to-wit</u>: A part of the Weasaw Reserve [metes and bounds description using center line of said C.C.&L. R.R. as a reference point] . . . Said several strips being 80 feet in width or forty feet on each side of the center line of said RR track containing three (3) Acres more or less.

<u>Id.</u> Ex. A, ECF No. 42-4 (emphasis added).

Each of these deeds has the common feature of being designated specifically for railroad purposes by a clause indicating the easement shall persist only so long as it is used for those purposes.  Having found that recreational trail use is not within the scope of an easement thus limited, the court finds that recreational trail use is outside the scope of the three easements created by what the defendant has termed the "Railroad Purposes" deeds.

## 5.    Condemnation or Prescription

The railroad acquired its right-of-way over certain parcels held by the plaintiffs by

prescription or condemnation, rather than via voluntary transfer.  While the defendant

indicates that some or perhaps all such acquisitions are represented in the Release of

Right of Way deeds at issue, briefing suggests that there may be parcels over which the

right-of-way was acquired via prescription or condemnation and for which no deed exists.

The plaintiffs argue that when a railroad acquires an easement via prescription or

condemnation, the greatest interest it may acquire is an easement for railroad purposes.

The government contends that railroads acquire an easement for general purposes in such

circumstances.

The court agrees with the plaintiffs that under Indiana law when a railroad acquires

property by prescription or by condemnation, a railroad generally obtains an easement for

railroad purposes.  In the context of prescription, the court in Meyer v. Pittsburgh,

Cincinnati, Chicago & St. Louis Railway, 113 N.E. 443, 447 (Ind. App. 1916), was

presented with the question of what interest a railroad had acquired as a result of its

adverse possession of certain property held by a private landowner.  The court held that

while the railroad's charter might have permitted it to acquire land in fee through a

contractual conveyance, "the general rule [is] that where a railroad right of way is

acquired by prescription, the company takes only an easement."  Meyer, 113 N.E at 446

(citations omitted).  The court in Meyer was informed by decisions in which the Indiana

Supreme court had held that acquisition via prescription "established merely a right

sufficiently broad to protect the use as it had been exercised."  Id. at 446-47 (citing

Brookville & M. Hydraulic Co. v. Butler, 91 Ind. 134 (1883); Indianapolis Water Co. v.

54

Kingman & Co., 58 N.E. 715 (Ind. 1900)).  Meyer thus held that regardless of the

railroad's ability to otherwise acquire land in fee, the easement acquired by prescription

"is an easement to use and occupy such lands for the purpose of maintaining and

operating its railroad on and over the same, rather than an estate in fee simple in the

land."  Id. at 477 (emphasis added).  Indiana courts have also routinely held that, as a

general rule, a railroad in the state acquires an easement, rather than a fee interest, in a

right-of-way through a condemnation proceeding.[23]  See, e.g., Hoffman, 97 N.E. at 1017

("It is the settled law of this state that a railroad company by condemnation proceedings

for a right of way acquires only an easement in the land appropriated." (citing Cleveland,

Cincinnati, Chicago & St. Louis Ry. Co. v. Doan, 94 N.E. 598 (Ind. App. 1911); Chicago

& W. Mich. R.R. Co. v. Huncheon, 130 N.E. 646 (Ind. 1892); Cincinnati, Indianapolis,

St. Louis. & Chicago Ry., 21 N.E. 470; Quick v. Taylor, 16 N.E. 588 (Ind. 1888))).

Additionally, Indiana law is such that the scope of such easements acquired by

prescription and condemnation is limited to the use for which the easement is created.  As

noted above, the general rule in Indiana is such that a "grantee is entitled to, and only to,

such a way as is reasonably necessary and convenient for the purposes for which it was

created."  McCauley, 928 N.E.2d at 315 (emphasis added).  The defendant apparently

agrees that the railroad's use of the right-of-way acquired by condemnation was limited,

---

[23]A railroad may, if authorized by its specific charter, acquire fee.  See Prather v. W. Union Tel. Co, 89 Ind. 501 (1883).  The defendant indicated in its motion for summary judgment that it was engaged in efforts to obtain evidence of the charters of the railroad companies that obtained the right-of-way at issue.  Def.'s Mot. Summ. J. 28, ECF No. 33-1.  It is agreed that if the railroad is found to have acquired a fee interest that compensation is not owed.

stating, "In the absence of an express statute authorizing the appropriation of land in fee simple, as a general rule in Indiana, when a railroad company acquires a property interest by condemnation or prescription, it acquires an easement <u>for railroad purposes</u>." Def.'s Mot. Summ. J. 28, ECF No. 33-1 (emphasis added) (citing <u>Quick</u>, 16 N.E. 588; <u>Hoffman</u>, 97 N.E. at 1017; <u>Indianapolis, Peru & Chicago Ry. Co. v. Rayl</u>, 69 Ind. 424 (1880)).

The court thus finds that, to the extent the railroad obtained its right-of-way via condemnation or prescription, the right of way is limited to use for railroad purposes, which, as stated above, does not include use as a recreational trail.

### E.     Taking: Imposition of a New Easement

Having concluded that under Indiana law the easements at issue in this case do not include recreational trail use within their scope, the court finds that the imposition of a recreational trail on the plaintiffs' underlying fee interest in the subject rights-of-way has resulted in a taking.[24]

The plaintiffs contend that the court must now value their property interest without regard to the fact that under the operable Indiana statutes the railroad line has not been legally "abandoned." The plaintiffs argue that the recreational trail extinguished the railroad easement and therefore formal abandonment as a rail line is not a relevant consideration in valuation. The government argues that Indiana statutes prevent the abandonment of the right-of way easements without an order from the STB and therefore

---

[24]As discussed <u>supra</u> Parts II.C.3 and 4, no taking has resulted where certain plaintiffs do not hold an underlying fee interest.

the court cannot ignore the issue of abandonment in valuing the property taken.  The court reserves judgment on the question of whether the Indiana statute on railroad abandonment is relevant to valuing the property interests taken from the plaintiffs.  This issue will be resolved in the damages phase of the case.

## III.    CONCLUSION

For the foregoing reasons, the plaintiffs' motion for summary judgment is **GRANTED-IN-PART** with respect to each of the deeds at issue other than those affected by the intervening Shields and Powell deeds transferring fee and with respect to portions of right-of-way acquired via prescription or condemnation and not otherwise evidenced by a deed in the record.  The defendant's motion for summary judgment is **GRANTED-IN-PART** with respect to the Shields and Powell deeds and otherwise **DENIED**.  The parties shall file a joint status report detailing next steps for resolving the issue of just compensation by **April 20, 2011**.

**IT IS SO ORDERED**.

s/Nancy B. Firestone_____
NANCY B. FIRESTONE
Judge